IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| CALIPER LIFE SCIENCES, INC., and XENOGEN CORPORATION<br><br>and<br><br>THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY<br><br>Plaintiffs,<br><br>v.<br><br>CARESTREAM HEALTH, INC.<br><br>Defendant. | Civil Action No.:<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Caliper Life Sciences, Inc. ("CLS") and its wholly owned subsidiary Xenogen Corporation ("Xenogen", and collectively with CLS, "Caliper") are leading providers of cutting-edge technologies that enable researchers in the life sciences field to create life-saving and life-enhancing medicines and diagnostic tests. Caliper is dedicated to innovating and commercializing new technologies to bridge the gaps in bringing *in vitro* assays to *in vivo* results so its customers can discover and develop cures for, and tests to diagnose, human disease. Caliper's customers use Caliper's *in vivo* imaging systems (IVIS®) to perform, among other things, certain methods for preclinical non-invasive imaging of mammals that are covered by a suite of patents that Caliper, through Xenogen, exclusively licenses from The Board of Trustees of the Leland Stanford Junior University ("Stanford"). These patents include U.S. Patent Nos.

5,650,135 ("the '135 patent"); 7,198,774 ("the '774 patent"); 6,649,143 ("the '143 patent"); 6,939,533 ("the '533 patent"); 6,923,951 ("the '951 patent"); 6,890,515 ("the '515 patent"); and 6,908,605 ("the '605 patent") (collectively the "Caliper Patents" or "patents-in-suit"). (The Caliper Patents are attached to this Complaint respectively as Exhibits A to G.) The Caliper Patents encompass methods for non-invasive *in vivo* imaging of fluorescence and bioluminescence in animals. Caliper's IVIS molecular imaging systems are designed, among other things, to identify disease pathways, determine mechanisms of action, evaluate drug compounds, and monitor a compound's effects on disease progression in living animals. Plaintiffs Stanford and Caliper, for their Complaint against Defendant Carestream Health, Inc. ("Carestream"), allege as follows:

## NATURE OF SUIT

1. This suit arises under the United States patent laws (35 U.S.C. § 271 *et seq*.) based on Carestream's infringement of the Caliper Patents.

2. Stanford owns the patents-in-suit.

3. CLS has rights in the Caliper Patents through its wholly-owned subsidiary Xenogen, which CLS acquired in August, 2006. Xenogen licenses the Caliper Patents pursuant to an exclusive license agreement with Stanford. The license agreement authorizes Xenogen to bring suit in its own name to enforce the Caliper Patents.

## THE PARTIES

4. Stanford is a trust possessing corporate powers that is organized under the laws of California, with a principal place of business at the Office of the President, Building 10 Main Quad, Stanford, California, 94305.

5.      Both CLS and Xenogen are Delaware corporations, having their principal place of business at 68 Elm Street, Hopkinton, Massachusetts, 01748.

6.      Carestream is a Delaware corporation with its headquarters located in Rochester, New York.  Carestream has continuous, significant contacts in the state of Texas, where it markets and sells digital imaging products, and where it maintains a place of business at 6200 Tennyson Parkway, Plano, Texas 75004.  Upon information and belief, Carestream also solicits and conducts business in the state of Texas through its presence on the World Wide Web and through its designated sales representative for Texas, Mr. Michael Holloway, thereby purposefully availing itself of the privilege of conducting business in the state of Texas. Carestream also maintains a registered agent in the state of Texas.

## JURISDICTION AND VENUE

7.      This action for patent infringement arises under the patent laws of the United States, United States Code, Title 35.

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

9.      This Court has personal jurisdiction over Carestream because, upon information and belief, Carestream maintains continuous contacts in the state of Texas as set forth in paragraph 6, *supra.*

10.     Venue is proper in this district under 28 U.S.C. §§ 1391 and 1400(b) because Carestream is subject to personal jurisdiction in the forum and is therefore deemed to reside in this district.

## STATEMENT OF FACTS

**A.     The Caliper Patents**

11.     The Caliper Patents are directed generally to methods for non-invasive, *in vivo* optical imaging.  The patents relate to various imaging methods utilizing cells that have been modified to express or produce a light-generating moiety, *e.g.,* a fluorescent protein or a bioluminescent protein.

12.     As an example, Claim 1 of the '951 patent reads:

A non-invasive method for detecting transformed eukaryotic cells in a mammalian subject, comprising: administering to the subject eukaryotic cells transformed with a heterologous gene encoding a bioluminescent protein, wherein said subject comprises opaque tissue, and measuring photon emission through opaque tissue of said subject wherein said photon emission is mediated by bioluminescent protein expressed from said heterologous gene.

**B.     The Carestream Devices**

13.     Carestream markets at least five devices in its In-Vivo Molecular Imaging Solutions product line (the "Carestream Devices"):  (i) KODAK In-Vivo Imaging System FX, (ii) KODAK In-Vivo Imaging System FX Pro, (iii) KODAK In-Vivo Imaging System F, (iv) KODAK In-Vivo Multispectral Imaging System FX, and (v) KODAK In-Vivo Multispectral Imaging System F.  Also among the Carestream Devices are at least six products in Carestream's Image Station Molecular Imaging Solutions product line, including (i) the Kodak Image Station 2000MM (IS2000), (ii) Kodak Image Station 2000R, (iii) Kodak Image Station 4000MM, (iv) Kodak Image Station 4000MM Pro, (v) Kodak Image Station 4000R Pro, and (vi) Kodak Image Station 4000R.

14.     According to Carestream's website (http://www.carestreamhealth.com/publicIndex.aspx?LangType=1033) (last visited January 8, 2010), the Carestream Devices can identify molecular abnormalities that are the origin of disease

4

at an early stage through non-invasive measurement of biological processes within a living organism.

15.     Upon information and belief, the Carestream Devices contain fluorescence imaging modes capable for use in *in vivo* imaging of small animals.

16.     Upon information and belief, the Carestream Devices contain bioluminescence imaging modes capable for use in *in vivo* imaging of small animals.

17.     Carestream's marketing of the Carestream Devices that fall within the In-Vivo Molecular Imaging Solutions product line promotes the infringing uses of the Carestream Devices by stating the Carestream Devices can be used to "[i]mage in multi-wavelength fluorescent, radioisotopic, luminescent, and X-ray modes to improve the anatomical localization of biomarkers *in vivo*."

18.     As shown below, the Carestream Devices can be and have been used in a manner that infringes the Caliper Patents.

**C.     The Carestream Devices Have Been Used to Directly Infringe the Caliper Patents**

19.     Independent claim 1 of the '533 patent recites:

A non-invasive method for detecting expression of a heterologous gene in a living, non-human, mammalian subject, said method comprising providing a mammalian subject whose cells comprise a transgene, wherein (i) said transgene comprises a heterologous gene that encodes a fluorescent protein, (ii) expression of the heterologous gene is mediated by a promoter and (iii) said subject comprises opaque tissue; and measuring photon emission through opaque tissue of said subject wherein said photon emission is mediated by excitation of said fluorescent protein expressed from said heterologous gene.

20.     The Carestream Devices have been used to carry out methods that directly infringe the Caliper Patents.  Among the larger universe of directly infringing uses of the Carestream Devices, three such examples follow.

### 1. *Scientific Insights,* **Image Station 2000ᴍᴍ X-ray Imaging Module**

21.     One example of directly infringing activity is depicted in a paper that Carestream published on its website, attached to this Complaint as Exhibit H (the "Scientific Insights Paper").

22.     The Scientific Insights Paper states that researchers studying a live mouse "stably transfected [tumor cells] with a fluorescence protein which were identified and evaluated using multiple fluorescence and x-ray imaging modes." *Id.*, page 1.

23.     The Scientific Insights Paper further states that images were acquired using the Kodak Image Station 2000ᴍᴍ (IS2000). *Id.*

24.     The Kodak Image Station 2000ᴍᴍ (IS2000) is one of the Carestream Devices. *Id.*

25.     The Scientific Insights Paper further states that researchers used a heterologous gene encoding "Red Fluorescent Protein" ("RFP"), *i.e.*, a transgene, and expressed it in tumor cells in a mouse (a non-human mammal). *Id.* The paper states that tumor cells "were transfected with pDsRed 1-C1/NEO vector expressing DsRed fluorescent protein (DsRFP)." To "express" DsRFP, the expression must be mediated by a promoter. *Id.*

26.     In addition, the Scientific Insights Paper explains the following non-invasive detection method:

> One week after the injection of DsRFP cells, mice were anesthetized by intramuscular injection of ketamine hydrochloride for in vivo imaging. The area to be imaged was shaved and further treated with Nair to completely remove all hair.

*Id.* The Scientific Insights Paper continues, "DsRed expressing tumor cells were identified using 535 nm excitation and 600 nm wide angle emission filtering. Images were collected for 60 sec with no binning." *Id.* This description shows that the researchers detected photon emission from

the RFP through the opaque tissue of the skin of an anesthetized mouse. This photon emission was mediated by excitation of the RFP expressed from the heterologous gene.

27.     The Scientific Insights Paper indicates that each step of the method in claim 1 of the '533 patent was performed to obtain the image obtained using the Kodak Image Station 2000MM (IS2000). For example, according to the Scientific Insights Paper, the mouse (a living, non-human, mammalian subject comprising opaque tissue) contained transgenic tumor cells expressing RFP (thus, the cells contained a heterologous gene encoding a fluorescent protein), the expression of which was mediated by a promoter and the Kodak Image Station 2000MM (IS2000) non-invasively imaged the fluorescence caused by excitation of the RFP, effectively measuring photon emission through opaque tissue.

28.     The activity described in the Scientific Insights Paper meets each and every limitation of Claims 1, 2, 10, 12, 19, 23-26, 36, 43, 47, and 48 and likely others of the '533 patent.

29.     Additionally, the activity described in the Scientific Insights Paper also infringes directly at least Claims 1, 8, 10, 11, 14, 16, and 19 and likely others of the '135 patent; Claims 1, 2, 8, 16, and 17 and likely others of the '774 patent; and Claims 1-3, 10, 11, 13, 16, 23, 27, 28, 30, and 36 and likely others of the '143 patent.

30.     Upon information and belief, the infringing acts described in the Scientific Insights Paper occurred within the United States.

**2.  Transgenic GFP Mouse**

31.     Another example of directly infringing activity appears on Carestream's website on a page promoting the uses of Carestream's Kodak Image Station, one of the Carestream Devices.

(Carestream Molecular Imaging, Kodak Image Station Images, In Vivo Green Fluorescence Imaging,  http://www.carestreamhealth.com/imageStation-image-gallery.html (last visited Jan. 28, 2010), attached to this Complaint as Exhibit I).

32.     The images of transgenic Green Fluorescent Protein ("GFP") mice appear under a heading that states "In-Vivo Green Fluorescence Imaging", described as depicting "Transgenic Green Fluorescent Mouse: Pregnant" and "Transgenic Green Fluorescent Mouse: Embryos extracted".

33.     On information and belief, the images depicted on Carestream's website under the heading "In-Vivo Green Fluorescence Imaging" depict transgenic GFP expressing mice.  GFP is a protein that can be expressed from a gene that is introduced into the germ line (cells that give rise to sperm or eggs) of mice through well-known techniques.  Breeding mice with a transgenic GFP gene introduced into their germ line can yield offspring capable of expressing transgenic GFP in all or many of their cells.

34.     On information and belief, collection of one or more of the images depicted under the "In-Vivo Green Fluorescence Imaging" heading of the Carestream website infringed claim 1 of the '533 patent.  The detection method employed to produce the image is "non-invasive". Additionally, on information and belief, the mouse or mice depicted are expressing transgenic GFP, which is a heterologous protein encoded by a heterologous gene.  To "express" the heterologous gene, the expression of GFP must be mediated by a promoter.  On information and belief, to produce the images depicted under the "In-Vivo Green Fluorescence Imaging" heading, photon emission must have been mediated by excitation of the GFP with subsequent photon emission detected through the opaque tissue of the mouse.  On information and belief, the

images depicted under the "In-Vivo Green Fluorescence Imaging" heading were collected using a Kodak Image Station instrument.

35.     On information and belief, these images were obtained at the Van Andel Institute, located in the United States.

36.     On information and belief, images depicted under the "In-Vivo Fluorescence Imaging" heading on Carestream's website depict images that were obtained by infringing claims 1, 2, 3, 4, 8, 10, 12, 23, 24, 25, 26, 27, 28, 32, 34, 36, 47, and 48 and likely others of the '533 patent.

37.     Additionally, on information and belief, images depicted under the "In-Vivo Fluorescence Imaging" heading on Carestream's website depict images that were obtained by infringing claims 1, 3, 8, 10, 14, 16, and 17 and likely others of the '135 patent; Claims 1, 2, 3, 5, 6, 10, 11, 14, 18, 23, 24, 25, 27, 28, 31, 32, and 36 and likely others of the '143 patent; and Claims 1, 2, 3, 4, 8, 9, 16 and 17 and likely others of the '774 patent.

### 3.   Madero-Visbal *et al.*

38.     The Madero-Visbal *et al.* abstract entitled "In situ bioluminescent imaging of xenograft progression in an orthotopic mouse model," *Journal of Clinical Oncology*, June 2008 Vol. 26, No. 15S (May 2008) (the "Madero-Visbal Abstract"), shows a third example of direct infringement.  (The Madero-Visbal Abstract is attached to this Complaint as Exhibit J.)

39.     Claim 1 of the '774 patent recites:

A non-invasive method for detecting cells under study from within a mammalian subject, comprising: administering to the mammalian subject a conjugate of the cell and a light-generating moiety; and measuring photon emission through an opaque tissue of said mammalian subject from the light-generating moiety.

40.     The Madero-Visbal Abstract describes using "human cell lines, tagged with firefly luciferase, and bioluminescent imaging to monitor growth, invasion, and metastasis of xenografts *in situ.*"

41.     In particular, the Madero-Visbal Abstract states that researchers injected luciferase-tagged cancer cells into athymic mice and that "Four days after inoculation [with luciferase-tagged cancer cells], all mice received intraperitoneal injections of D-Luciferin, 333 μg/g body weight, and xylazine/ketamine anesthesia."  According to the Madero-Visbal Abstract, "Animals were then imaged using the Kodak In-Vivo Imaging System to detect bioluminescence emitted from engrafted tumors."  The authors state, "Bioluminescence intensity correlated strongly with histologic tumor areas and volumes."

42.     The activity described in the Madero-Visbal Abstract directly infringes claim 1 the '774 patent because the researchers administered human cancer cells expressing luciferase (*i.e.,* a conjugate of a cell and the light generating moiety luciferase) to mice (mammalian subjects).  The anesthetized animals were then imaged using the Kodak In-Vivo Imaging System to detect bioluminescence emitted from the engrafted tumors.  This description shows that researchers detected photon emission from the bioluminescence through the opaque tissue of the anesthetized mouse.

43.     In addition to infringing Claim 1 of Caliper's '774 patent, the activity described in the Madero-Visbal Abstract also infringes Claims 2, 11, 12, 14, 16, and 17 and likely other claims of the '774 patent.

44.     The activity described in the Madero-Visbal Abstract also infringes at least Claims 1, 8, 9, 10, 11, 14, 16, and 18-20 and likely others of the '135 patent; Claims 1, 2, 8, 11, 13-15, 17, 21, 24, 26-29, 35, 41, 42, 44, 48, 51, 53, and 54 and likely others of the '951 patent;

45.     Upon information and belief, the acts described in the Madero-Visbal Abstract occurred within the United States.

**D.     Carestream Had Actual Notice of the Caliper Patents**

46.     Xenogen exclusively licensed from Stanford the patents referred to in this Complaint as the Caliper Patents (or the applications that later resulted in the Caliper Patents). By 2006, at the latest, Xenogen had notified Eastman Kodak Company's ("Kodak") Health Care Division that the marketing and sale of the Carestream Devices constituted an inducement of infringement of at least four of the Caliper Patents.

47.     In January 2007, Eastman Kodak Company sold the assets relating to the Kodak Health Care Division, including the assets relating to Kodak's Molecular Imaging Systems Group, to a wholly owned subsidiary of Onex Corporation.

48.     Following the completion of this sale, Onex Corporation operated the business of the former Kodak Health Care Division through its wholly owned subsidiary Carestream. Carestream sells or has sold at least five devices in its "In-Vivo Molecular Imaging Solutions" product line and at least six devices in its "Image Station Molecular Solutions" product line, all of which are Carestream Devices, under a licensed use of the Kodak name.

49.     In connection with the purchase of the Kodak Health Care Division, Onex Corporation and Carestream received notice of Xenogen's prior infringement claims through Eastman Kodak Company's quarterly report (10 Q) filed with the Securities and Exchange Commission, dated May 9, 2007.  (See Exhibit K attached to this Complaint.)

50.     In August 2009, Caliper sent Carestream a letter, again notifying Carestream of the Caliper Patents and that Carestream's marketing induced infringement of the Caliper Patents. (See Exhibit L attached to this Complaint.)

51.     Despite receiving actual notice that its conduct induces infringement of the Caliper Patents, Carestream continues to market its Carestream Devices in a manner that induces infringement.

52.     Following that August 2009 letter, Caliper and Carestream engaged in discussions by e-mail and telephone regarding Caliper's concerns, but Carestream continued to avoid acknowledging the wrongful nature of its sales and marketing activities for the Carestream Devices.

**E.     Carestream Specifically Intended to Encourage Acts of Direct Infringement**

53.     Carestream specifically intended, and continues to intend, to induce users of the Carestream Devices to infringe the Caliper Patents.

54.     For example, a Carestream representative named Mr. William McLaughlin attended the 2009 American Association of Cancer Research Annual Meeting where he promoted using the Carestream Devices to conduct multispectral fluorescence and luminescence *in vivo* imaging.  As part of his publicity efforts, Mr. McLaughlin displayed images that were obtained by practicing methods within the scope of the Caliper Patents.

55.     In addition, on its website, Carestream publishes "Scientific Insights," describing techniques and depicting data that have been acquired using infringing methods.  At least one of these publications reflects work that infringes the Caliper Patents.

56.     More recently, Carestream representative Mr. Doug Kelley, the Western Regional Sales Manager for Carestream's Molecular Imaging Systems Group, contacted a contract

57.     In response to Mr. Kelley's information, the VA's contract negotiations officer explained the need to image bioluminescent bacteria in a mouse infection model, a method within the scope of the '135 patent, the '774 patent and the '605 patent.  Mr. Kelley replied to the VA that Carestream's system had the ability to meet those requirements, referring the contract negotiations officer to several universities that have used Carestream instruments to "image bioluminescent bacteria."   Mr. Kelley further offered to share "a complete list of all" the publications demonstrating that the "Carestream system is used extensively in bioluminescence applications worldwide."

58.     The VA ultimately decided to purchase the Caliper IVIS system rather than the Carestream *in vivo* imaging system.  However, if the VA had purchased the Carestream system and used it in the manner suggested by Mr. Kelley, the VA's use of the Carestream system would have infringed the Caliper Patents.  Mr. Kelley's actions clearly demonstrate that Carestream markets its *in vivo* imaging systems in a manner that intends to induce infringement of the Caliper Patents.

### COUNT I

**(Infringement of the '135 Patent Pursuant to 35 U.S.C. § 271)**

59.     The allegations of paragraphs 1-58 above are repeated and re-alleged as if set forth fully herein.

60.     Upon information and belief, Defendant Carestream literally or under the doctrine of equivalents infringes or induces others to infringe one or more claims of the '135 patent pursuant to 35 U.S.C. § 271(a) and/or (b).

61.     Upon information and belief, Defendant Carestream's infringement of the '135 patent has been knowing and willful.

62.     Defendant Carestream's infringement of the '135 patent causes Plaintiffs Stanford and Caliper to suffer substantial money damages.

63.     Defendant Carestream's infringement of the '135 patent causes Plaintiffs Stanford and Caliper to suffer irreparable harm for which there is no adequate remedy at law.

## COUNT II

### (Infringement of the '774 Patent Pursuant to 35 U.S.C. § 271)

64.     The allegations of paragraphs 1-58 above are repeated and re-alleged as if set forth fully herein.

65.     Upon information and belief, Defendant Carestream literally or under the doctrine of equivalents infringes or induces others to infringe one or more claims of the '774 patent pursuant to 35 U.S.C. § 271(a) and/or (b).

66.     Upon information and belief, Defendant Carestream's infringement of the '774 patent has been knowing and willful.

67.     Defendant Carestream's infringement of the '774 patent causes Plaintiffs Stanford and Caliper to suffer substantial money damages.

68.     Defendant Carestream's infringement of the '774 patent causes Plaintiffs Stanford and Caliper to suffer irreparable harm for which there is no adequate remedy at law.

## COUNT III

### (Infringement of the '143 Patent Pursuant to 35 U.S.C. § 271)

69.     The allegations of paragraphs 1-58 above are repeated and re-alleged as if set forth fully herein.

70.     Upon information and belief, Defendant Carestream literally or under the doctrine of equivalents infringes or induces others to infringe one or more claims of the '143 patent pursuant to 35 U.S.C. § 271(a) and/or (b).

71.     Upon information and belief, Defendant Carestream's infringement of the '143 patent has been knowing and willful.

72.     Defendant Carestream's infringement of the '143 patent causes Plaintiffs Stanford and Caliper to suffer substantial money damages.

73.     Defendant Carestream's infringement of the '143 patent causes Plaintiffs Stanford and Caliper to suffer irreparable harm for which there is no adequate remedy at law.

## COUNT IV

### (Infringement of the '533 Patent Pursuant to 35 U.S.C. § 271)

74.     The allegations of paragraphs 1-58 above are repeated and re-alleged as if set forth fully herein.

75.     Upon information and belief, Defendant Carestream literally or under the doctrine of equivalents infringes or induces others to infringe one or more claims of the '533 patent pursuant to 35 U.S.C. § 271(a) and/or (b).

76.     Upon information and belief, Defendant Carestream's infringement of the '533 patent has been knowing and willful.

77.     Defendant Carestream's infringement of the '533 patent causes Plaintiffs Stanford and Caliper to suffer substantial money damages.

78.     Defendant Carestream's infringement of the '533 patent causes Plaintiffs Stanford and Caliper to suffer irreparable harm for which there is no adequate remedy at law.

**COUNT V**

**(Infringement of the '951 Patent Pursuant to 35 U.S.C. § 271)**

79.     The allegations of paragraphs 1-58 above are repeated and re-alleged as if set forth fully herein.

80.     Upon information and belief, Defendant Carestream literally or under the doctrine of equivalents infringes or induces others to infringe one or more claims of the '951 patent pursuant to 35 U.S.C. § 271(a) and/or (b).

81.     Upon information and belief, Defendant Carestream's infringement of the '951 patent has been knowing and willful.

82.     Defendant Carestream's infringement of the '951 patent causes Plaintiffs Stanford and Caliper to suffer substantial money damages.

83.     Defendant Carestream's infringement of the '951 patent causes Plaintiffs Stanford Caliper to suffer irreparable harm for which there is no adequate remedy at law.

**COUNT VI**

**(Infringement of the '515 Patent Pursuant to 35 U.S.C. § 271)**

84.     The allegations of paragraphs 1-58 above are repeated and re-alleged as if set forth fully herein.

85.     Upon information and belief, Defendant Carestream literally or under the doctrine of equivalents infringes or induces others to infringe one or more claims of the '515 patent pursuant to 35 U.S.C. § 271(a) and/or (b).

86.     Upon information and belief, Defendant Carestream's infringement of the '515 patent has been knowing and willful.

16

87.     Defendant Carestream's infringement of the '515 patent causes Plaintiffs Stanford and Caliper to suffer substantial money damages.

88.     Defendant Carestream's infringement of the '515 patent causes Plaintiffs Stanford and Caliper to suffer irreparable harm for which there is no adequate remedy at law.

**COUNT VII**

**(Infringement of the '605 Patent Pursuant to 35 U.S.C. § 271)**

89.     The allegations of paragraphs 1-58 above are repeated and re-alleged as if set forth fully herein.

90.     Upon information and belief, Defendant Carestream literally or under the doctrine of equivalents infringes or induces others to infringe one or more claims of the '605 patent pursuant to 35 U.S.C. § 271(a) and/or (b).

91.     Upon information and belief, Defendant Carestream's infringement of the '605 patent has been knowing and willful.

92.     Defendant Carestream's infringement of the '605 patent causes Plaintiffs Stanford and Caliper to suffer substantial money damages.

93.     Defendant Carestream's infringement of the '605 patent causes Plaintiffs Stanford and Caliper to suffer irreparable harm for which there is no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Stanford and Caliper ask this Court to enter Final Judgment in their favor:

A.     Finding that Defendant Carestream has infringed each of the '135 patent, the '774 patent, the '143 patent, the '533 patent, the '951 patent, the '515 patent, and the '605 patent;

B.     Entering a permanent injunction enjoining Defendant Carestream and its affiliates, subsidiaries, officers, directors, employees, agents, representatives, licensees,

17

successors, assigns and all those acting for them or on their behalf, or acting in concert or privity with them, from inducing further infringement of each of the '135 patent; the '774 patent; the '143 patent; the '533 patent; the '951 patent; the '515 patent; and the '605 patent;

C.    Awarding Plaintiffs Stanford and Caliper compensatory damages against Defendant Carestream under 35 U.S.C. § 284;

D.    Awarding Plaintiffs Stanford and Caliper treble damages for Defendant Carestream's willful infringement;

E.    Awarding costs and reasonable attorneys' fees in favor of Plaintiffs Stanford and Caliper; and

J.    Awarding Plaintiffs Stanford and Caliper any further relief that this Court may deem appropriate.

## JURY DEMAND

Plaintiffs Stanford and Caliper demand that this case be tried before a jury.

18

Dated:  February 23, 2010

Respectfully submitted,

Wilson, Robertson & Cornelius, P.C.
P.O. Box 7339
Tyler, Texas 75711-7339
Telephone:     (903) 509-5000
Facsimile:      (903) 509-5091
wc@wilsonlawfirm.com

BY:     /s/ William Cornelius
WILLIAM CORNELIUS
State Bar No. 04834700

ATTORNEYS FOR

CALIPER LIFE SCIENCES, INC.,
XENOGEN CORPORATION
and
THE BOARD OF TRUSTEES OF THE
LELAND STANFORD JUNIOR
UNIVERSITY

Mark Fox Evens
mevens@skgf.com
Eldora L. Ellison
eellison@skgf.com
Byron L. Pickard
bpickard@skgf.com
Justin T. Sher
jsher@skgf.com
STERNE, KESSLER, GOLDSTEIN & FOX PLLC
1100 New York Avenue, NW
Washington, D.C.  20005-3934
(202) 371-2600

*Attorneys for Caliper Life Sciences, Inc. and Xenogen Corporation*

Teresa M. Corbin Esq.
CorbinT@howrey.com
Howrey LLP
525 Market Street
Suite 3600
San Francisco, CA 94105-2708
(415) 848-4944

*Attorneys for The Board of Trustees for The Leland Stanford Junior University*
**1065131_3.doc**